Goss, Judge.
*568 In this discretionary appeal, the Macon-Bibb County Planning and Zoning Commission ("the Commission") appeals from the superior court order reversing its denial of a conditional use permit for a railroad spur transfer station to unload ethanol into a pipeline. The Commission contends that the superior court erred in (1) failing to consider its answer to the certiorari petition; (2) failing to adhere to the deferential standard of review in a certiorari proceeding; and (3) issuing a final decision rather than remanding the case to the Commission for a new hearing. For the reasons that follow, we reverse.
"When reviewing a local governing body's zoning decision, the superior court applies the any evidence standard of review. In the appellate courts, the standard of review is whether there is any evidence supporting the decision of the local governing body, not whether there is any evidence supporting the decision of the superior court." (Citation and punctuation omitted.) Bulloch County Bd. of Commrs. v. Williams , 332 Ga. App. 815, 773 S.E.2d 37 (2015).
So viewed, the record shows that Epic Midstream, LLC, a handler of petroleum fuels, acquired roughly 80 acres of property ("the property") at the intersection of Barnes Ferry Road with Sofkee *569 Road and *405 the Norfolk Southern rail line in Bibb County. Some of the property was zoned M-1 Light Industrial ("M-1"),[1] but a portion was zoned Agricultural. Epic sought to have the entire property zoned M-1 and filed a rezoning application on February 4, 2015. The application was deferred numerous times before Epic was instructed to also apply for a conditional use permit, which it did on June 4, 2015. Both applications were subsequently withdrawn, and Epic then submitted new applications for rezoning and a conditional use permit. The application sought conditional use approval pursuant to Section 16.03 of the Comprehensive Land Development Resolution for the City of Macon and Bibb County, Georgia ("CLDR") to build and operate a railroad spur transfer station for the offloading of ethanol from railroad tanker cars directly into an underground pipeline which would transport the ethanol to Epic's petroleum distribution facility nearby.[2] A final hearing was held on Epic's applications on November 9, 2015, during which Epic presented testimony from its project director, the design firm's project manager, and a land planner.
During the hearing, the design manager testified that the rail cars carrying ethanol would be redirected from the Norfolk Southern rail line onto the rail spur, or "loop."[3] Sixteen train cars would be unloaded at a time, five times, for a total of 80 train cars at a time. The entire process would be completed within 24 hours, meaning it was likely that some of the process would take place during the night. Epic's project director testified that the unloading process would happen approximately once per month for a total of 13 unloadings per year. He further testified that the frequency could increase in the future based on contractual demands.
The land planner hired by Epic testified that there would be three access points to the property-two from Barnes Ferry Road and one from Sofkee Road. He explained that directly west of the property lies the main rail line, running parallel to Sofkee Road, and that the area further west is zoned M-2 Industrial, in which area a *570 truck loading facility with above-ground tanks is located.[4] At the time of the hearing, the area to the northwest of the property and west of the rail line was vacant and mostly zoned M-1. A residential neighborhood was located to the north of the property, on the other side of Barnes Ferry Road, nested in between the property and an Industrial Park. The land to the east of the property was primarily undeveloped with some residences scattered along Barnes Ferry Road. A large farm was located directly southeast of the property while the area directly to the south was largely undeveloped and zoned Agricultural or M-1. Various industrial developments were located in the area southwest of the property, which was zoned M-1. The land planner testified that the region in which the property is located is "largely industrial," that the property is within close proximity to five industrial parks, and that the property is best suited to an industrial purpose. No homes had been built in the neighborhood abutting the property since 1991. According to him, this showed that this was not a "thriving" residential area, and the trajectory of the area did not point toward residential development. The land planner testified that the unloading area would be 320 feet from the nearest residential structure. *406 Three neighboring residents and a city council member spoke during the hearing as to the damage done to their properties by a jet-fuel pipeline leak that occurred in the 1980s in the same area, while the property was owned by NuStar Energy, LLC. Epic purchased the property as well as the jet-fuel pipeline from NuStar in 2012.[5] However, NuStar retained responsibility for the jet-fuel leak and its remediation.
Residents of the nearby neighborhood stated their opposition to the ethanol offloading station, citing their belief that their land was already "contaminated," that this development would further decrease their property values, and that another leak or spill would occur. Elaine Lucas, a member of the Macon-Bibb County Board of Commissioners (the "Board") and the Macon City Council representative for the nearby residents, believed that her constituents were suffering "environmental injustice" and still had no answers about the past jet-fuel pipeline leak.
The Commission granted Epic's application for rezoning, making the property M-1 in its entirety, but denied the application for a *571 conditional use permit to operate the rail spur and ethanol facility. Following the Commission's denial of the permit application, Epic filed a motion for a rehearing on the matter pursuant to CLDR § 27.13.[6] As part of its motion, Epic submitted revised site development plans, in which the proposed transfer facility was moved to the southern end of the property at a greater distance from the residential neighborhood to the north.[7] The revised plan also included additional engineering and safety controls, such as an earthen berm, which would serve as a containment device if any vapors were released and would run parallel to Barnes Ferry Road, providing an additional barrier between the residential neighborhood; additional fire hydrants; and a security fence to enclose the facility. Additionally, Epic communicated that it had met with a representative of the neighborhood and Elaine Lucas in an effort to coordinate a meeting with local residents to help alleviate their concerns and explain their new development plan.
Lucas again testified on behalf of the residents at the hearing on Epic's motion for rehearing, stating, "The major concern and the reason we don't want you to approve anything else is we are not sure of what's out there, what's in the ground. We are not sure the level of contamination. We are not sure whether any remediation has been done...." She asked that the Commission defer or deny the motion "until we get some answers [on those issues]" and until the neighborhood could set up a meeting with the Georgia Environmental Protection Division. Some nearby residents again stated their opposition. With the general consensus among the Commission being that nothing had changed and ethanol was still hazardous, the motion was denied on January 11, 2016.
Epic petitioned the superior court for certiorari pursuant to OCGA § 5-4-1 and Section 27.15 of the CLDR, arguing that it "met and exceeded every ascertainable and objective standard, criterion, term, *572 condition and requirement necessary for issuance of the Permit as requested," and that it had "a clear legal right to issuance of the Conditional Use Permit[.]" After a hearing for oral argument, the superior court granted Epic's petition, concluding that the Commission *407 grossly abused its discretion in denying Epic's application. The superior court reversed the Commission's decision and ordered that Epic's conditional use application be granted. The Commission subsequently filed an application for discretionary review, which this Court granted. This appeal followed. Additional facts adduced at the conditional use hearing before the Commission will be cited as necessary to consider the Commission's arguments.
1. In related enumerations of error, the Commission asserts that the superior court, applying judicial review by certiorari, erred because it weighed the evidence presented before the Commission rather than applying the appropriate any evidence standard. We agree.
When reviewing a local governing body's zoning decision by writ of certiorari, "[t]he scope of review is limited to all errors of law and determination as to whether the judgment or ruling below was sustained by substantial evidence." OCGA § 5-4-12 (b). "Substantial evidence" under this section has been consistently interpreted to mean "any evidence." City of Atlanta Government v. Smith , 228 Ga. App. 864, 865 (1), 493 S.E.2d 51 (1997). Thus, in order to reverse the judgment of the Commission, the superior court must conclude that the record below lacked "any" evidence to support the Commission's decision. Jackson County v. Earth Resources, Inc. , 280 Ga. 389, 627 S.E.2d 569 (2006). This Court's "standard of review is whether there is any evidence supporting the decision of the local governing body, not whether there is any evidence supporting the decision of the superior court." (Citation and punctuation omitted.) Id.
Neither the superior court nor this Court reweighs credibility determinations of the factfinder. In other words, because the factfinder in the initial proceedings is charged with weighing the evidence and judging the credibility of the witnesses, the superior court and this Court must view the evidence in the light most favorable to the factfinder's decision and must affirm the decision if there is any evidence to support it, even when the party challenging the factfinder's conclusions presented evidence during the initial proceedings that conflicted with those conclusions.
*573 (Citations omitted.) Dekalb County v. Bull , 295 Ga. App. 551, 552-553 (1), 672 S.E.2d 500 (2009).[8]
Section 303 (2) of the CLDR contains standards to be considered by the Commission, where applicable, in an application for a conditional use permit. Those standards, in pertinent part, are:
(a) The existing land use pattern....
(d) Whether the proposed use will be of such location, size, and character that, in general, it will be in harmony with the appropriate and orderly development of the area in which it is proposed to be situated and will not be detrimental to the orderly development of adjacent properties or a deterrent to the improvement of adjacent properties in accordance with the zoning classification of such properties, the existing land use pattern, or the comprehensive land development plan.
(e) Whether, in the case of any use located in, or directly adjacent to, a residential district or area:
(i) The nature and intensity of operations will be such that both pedestrian and vehicular traffic to and from the use and the assembly of persons in connection therewith will not be hazardous or inconvenient to, or incongruous with, said residential district or area, or conflict with the normal traffic of the neighborhood; and
(ii) The location and height of buildings, and other structures, and the nature and extent of screening, buffering or landscaping on the site will be such that the use will not hinder or discourage the appropriate development and use of adjacent land and buildings in conformance with existing *408 zoning districts and development pattern.
(f) Whether the proposed use will increase the population density resulting in the increase or overtaxing of the load on public facilities such as schools, utilities, streets, etc.; or approval of the use would encourage adjacent areas to *574 develop at higher densities than provided in the comprehensive plan resulting in the overtaxing of such public facilities.
(g) Whether the proposed use will cause a health hazard, a public safety problem, or nuisance created or excessively increasing traffic and associated congestion; creating a drainage problem; generating unnecessary disturbances due to noise, the emittance of smoke or other contaminants, odor, electrical interference or causing pollution to land, air and/or water.
(h) Whether the proposed change will adversely affect property values in adjacent areas.....
As detailed below, there was evidence presented before the Commission from which it could deny Epic's request for a conditional use permit under the standards set forth in Section 302 (2) of the CLDR. Notably, there was a written petition in the record before the Commission signed by nearly one hundred area residents opposing the related re-zoning application to allow the construction of the rail spur line and development of a renewable energy rail-to-pipeline loading station. This petition raised concerns about the flammable nature of the ethanol, concerns that the pipeline would devalue their property, and traffic and noise issues. The petitions also noted concerns about the hazardous nature of ethanol, and concerns regarding the potential for spills during the unloading process. Further, at the conditional use application hearing, a city council member and three area residents spoke in opposition, outlining additional specific concerns about prior contamination by a fuel pipeline leak in the area which required capping of area water wells. Reverend Arthur Hubbard, a pastor of a nearby church, explained that his church and community had been at that location for over a hundred and twenty years, before industrial uses moved into the area. He explained that his property and the property of his neighbors had already been contaminated and devalued by the prior jet fuel spill. Commissioner Lucas noted that the Macon-Bibb County Commission sent a letter to the Planning and Zoning Commission, asking it to defer the decision until residents could have a community meeting with the State of Georgia Environmental Protection Division. Another speaker brought evidence of a prior derailment of train cars carrying ethanol in another state to demonstrate that their fears regarding the potential for a spill or contamination were not unwarranted.
In October 2015, after Epic's initial application for re-zoning, ethanol was designated as a hazardous liquid by the Pipeline *575 Hazardous Materials Safety Administration ("PHMSA") and the Federal Railway Administration. See 49 C. F. R. § 195.2 ("Hazardous liquid means ... ethanol"); 49 U. S. C. A. § 60101 (a) (4) (C) (" 'hazardous liquid' means ... a substance that the Secretary of Transportation decides may pose an unreasonable risk of life or property when transported by a hazardous liquid pipeline facility in a liquid state"). After these changes were presented to the Commission, the planning report noted that "in light of the additional information regarding ethanol and its dangers to public health and welfare, staff has concerns that this proposed development will pose significant negative impacts to the adjoining and nearby properties." Further, the planning report stated that the rezoning would cause "negative impacts as light and noise from the rail cars and diesel locomotives that could affect adjacent properties" as well as concerns that ethanol is a "hazardous and flammable liquid that could pose a danger to the adjacent residents in the event of a derailment, spill, or fire." During the hearing, Epic was unable to confirm that the trains that would be transporting the ethanol would be retrofitted to comply with the newest regulations applying to the transportation of ethanol. Epic also responded to questions by concerned neighbors, and explained that although it would do its best to unload the pipeline during business hours, it was unable to guarantee that it would not happen at night. *409 In reversing the Commission's denial of the special use permit, the superior court's order cites to assurances by Epic that the chances of an accident or spill were low and that the operation was designed so as to avoid pollution to the area "land, air or water on or off property." The order notes that the superior court took
notice of the fear the community holds and the hardships it has endured in the past ... Yet, the issue at hand must be determined on more than fear alone. As stated above, generalized fears do not rise to the level of any evidence. The [c]ourt recognizes that the fear is real, but the evidence in opposition does not support any reasonable likelihood or probability of incident. The only evidence reflects a highly regulated process to ensure the proper handling of a substance ... Therefore, the Court sees no evidence to the degree necessary to support a denial of the application[.]
Unlike the generalized concerns voiced about landfills in Fulton County v. Bartenfeld , 257 Ga. 766, 363 S.E.2d 555 (1988), there were specific issues raised during the hearing about noise, traffic, possible contamination, and the flammability and *576 hazardous nature of ethanol that were specific to this tract and conditional use application. See Jackson County , 280 Ga. at 391, 627 S.E.2d 569 (finding that the local zoning board had evidence before it from which to deny a special use permit when, inter alia, residents raised specific concerns about the proposal to create a landfill in the area). There was record evidence before the Commission to support its decision to deny the conditional use application. The superior court's order acknowledges this evidence, but then weighs evidence in the record to conclude that there was "no evidence to the degree necessary to support a denial of the application based on the above standard." "It is not the law that only expert opinions could be presented to, and considered by, the Board, nor is the superior court to weigh the evidence before it; the question is whether there was any evidence before the Board to support its decision." Jackson County , supra. As the record supported the Commission's decision to deny the conditional use permit, the superior court erred in ordering the Board to issue it.
2. As a result of our holding in Division 1, the Commission's remaining enumerations of error are moot.
Judgment reversed.
Miller, P. J., concurs and Brown, J. dissents.*
*THIS OPINION IS PHYSICAL PRECEDENT ONLY, COURT OF APPEALS RULE 33.2(a).

Section 16.01 of the Comprehensive Land Development Resolution for the City of Macon and Bibb County provides that "[t]he M-1 district is intended for wholesale and light industrial uses where resultant noise, odors, pollution, and congestion are minimized. Residential development is prohibited. This district is not suitable for heavy industrial uses."

The rail spur would connect to the already-existing Norfolk Southern rail line, on which ethanol is currently transported in train cars. The pipeline had not yet been built, but had been approved by the Georgia Department of Transportation and the Macon-Bibb County Engineering Department.

We are unable to determine from the record the distance from the Northfolk Southern rail line to the rail spur at its farthest point from the rail line.

Per the CLDR, "[t]he M-2 Heavy Industrial District is intended to provide appropriate locations for any use which may be obnoxious or offensive by reason of emission of odors, dust, smoke, gas, noise, or vibration. Residential uses are prohibited in this district."

Epic planned to build a new pipeline to transport the ethanol using the existing right of way for the jet-fuel pipeline.

Section 27.13 of the CLDR provides that any applicant
whose application has been denied by the Commission may, within thirty (30) days from the date of disapproval, file an application for a rehearing. All motions for a rehearing by the Commission shall be heard in the same manner as any other application and may be granted if new or additional written information or graphical information that was not available at the time of the original hearing, or was not presented for excusable neglect, is shown. Such information shall be submitted at the time the request for rehearing application is filed.

In an email sent the month prior to the final hearing on Epic's applications, an urban planner for the Commission who was preparing the Commission staff report on the applications, asked Epic whether the transloading station could be "relocated to an area along the western property lines or to an area along the southern property lines." And if it could not, to "please explain."

See also OCGA § 5-4-15 (b) (when reviewing a lower tribunal's ruling on writ of certiorari, the superior court may only issue a final decision "if there is no question of fact involved which makes it necessary to send the case back for a new hearing before the tribunal below").